IKLEES, Judge.
On November 14, 1991, appellant was indicted for the second degree murder of Clint F. Thomas. Appellant pled not guilty at his arraignment on November 21, 1991. Following a trial by jury on May 13-14, 1993, appellant was found guilty as charged. Appellant was sentenced on June 25, 1993, to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.
FACTS
At approximately 9:00 p.m. on September 21,1991, Clint Thomas drove several children to a dance at Cohen High School. Thomas’s girlfriend, Rebecca Muse, was with him in the van. Thomas was the van driver for his mother’s day care center and also provided transportation to and from events for various schools. On his way back to his parents’ home, at the intersection of Delachaise and Dorgenois Streets, Thomas encountered another group of kids who needed a ride to the same dance. While talking with the kids, Thomas recognized appellant, Alvin Catchings, and noticed that appellant was wearing a medallion which belonged to Thomas’s sister, Joan. Thomas got out of the van to ask appellant how he came to have the medallion. Appellant explained that Joan had given him permission to wear the medallion. Thomas apparently believed that Joan must have given the medallion to appellant in exchange for something or as a pledge for a loan, so Thomas offered to buy the medallion back. Appellant refused. Thomas then offered to take appellant to Thomas’s mother’s house to return the medallion. Appellant again refused. Thomas then left and went to his parents’ house.
Thomas stayed inside his parents’ house only a few minutes. Muse waited in the vehicle. Inside the house, Thomas asked his mother about the medallion and she told him that Joan had indeed loaned the medallion to appellant. Thomas returned to the van and told Muse that he wanted to see if he could get the medallion back. The couple went back to where appellant was located and a verbal argument ensued. Thomas gave up and returned to the van, but appellant challenged him with, “You want it? You want it that bad, come take it.” Thomas got out of the van and tried to grab the medallion off of appellant’s |2neck, but the medallion had been removed beforehand. In his attempt, Thomas snagged appellant’s shirt. At this point, a physical fight began. Eventually, Thomas was able to break away from the fight and return in the van to his parents’ house.
Thomas was angry and making threats when he got to his parents’ home for the second time that evening. Delores Thomas, the victim’s mother, was having her hair done, so she asked her husband, Reverend John Henry Thomas, to speak to Clint. Rev. Thomas spoke with his son and witnessed his son emerge from the kitchen with an egg spoon. Rev. Thomas noted that there were knives in the kitchen, but the only item his son removed was the spoon. Rev. Thomas further testified that he never saw his son with a gun. He identified the metal object removed from the murder scene as the handle of the spoon removed from the kitchen by his son. Muse again waited in the van.
Fearing for her son’s safety, when Clint left the house, Delores Thomas had her daughter call the police and lie to them that Clint left with a gun and a knife, hoping that this would draw a quicker response. Clint then went with Muse towards the home of a friend. On his way there, Thomas was stopped by a boy apparently unknown to Muse. Thomas got out of the van to talk to the boy. Muse heard a bump against the van and realized that Thomas and the boy must be fighting. She urged Thomas to get back into the van. The fight had broken up when Muse noticed kids coming towards them from down the street. Thomas was going up to the front of the van facing towards Broad Street when appellant came up behind Thomas from Delachaise. Muse testified that appellant grabbed Thomas by the forehead and raised his arm to Thomas’s head. Muse then heard a shot and Thomas fell to the ground. Appellant looked at Muse, looked at the other boys, then ran. Appellant turned himself in to the police a few days later.
Muse stayed on the scene until the police came and was the only eyewitness to do so. Muse was highly emotional and, according to *1148 Officer Charlene Cha-Jua, fell on Cha-Jua when the officer arrived on the scene. The sobbing Muse actually grabbed Cha-Jua around the upper body. When Muse did this, Cha-Jua felt no unusual bulges which would indicate that Muse was concealing a weapon. The investigating officers found no guns or knives on the scene. The only weapon recovered was the spoon handle, apparently fashioned into brass knuckles.
IsThe police sent for an emergency vehicle which transported Thomas to Charity Hospital. Thomas died at Charity a short time later of a gunshot wound to the head. Because the wound was in the scalp area, and because sutures were placed over the wound during emergency treatment, the range from which the bullet was fired could not be determined.
The defense called three witnesses: Che-rylyn Hayes, Orvin Hartford and appellant. Cherylyn Hayes testified that she knew appellant, as he is her child’s uncle. She testified that she also knew the Thomas family, including Clint. On the night of the shooting, Hayes was doing Mrs. Thomas’s hair when Clint came in upset over the medallion. She testified that Clint’s sister Joan called the police and told them: “[S]he let her friend wear a medallion. Her brother was trying to take it, that he was going out there with a knife and a gun. If they need her to bring them to where he is and who he is with, she would, and that was it.”[1] Hayes admitted that she never saw Clint with anything when he left the house, and that she never saw a gun in the house.
According to Orvin Hartford, he was with appellant and others when Thomas first noticed the medallion on appellant’s neck and asked about it. Hartford testified that Thomas tried to put appellant in the van, then left to see if Joan Thomas really gave appellant permission to use the medallion. Hartford further testified that when Thomas came back, Thomas was threatening appellant. A fight between Thomas and appellant ensued and appellant’s shirt got torn. The fight ended, but Thomas was still threatening appellant, saying “You better watch your back.” Thomas then left and appellant ran.
Hartford further testified that he was leaving the area and going to his aunt’s house when Thomas drove toward him and got out of the van. Thomas swung at Hartford and grabbed Hartford around the neck. Thomas had something shiny in his hand which cut Hartford on the neck. Hartford viewed the spoon handle found on the scene and testified that the object in Thomas’s hand looked bigger, that the object looked like a knife. Hartford then heard a shot and turned around to find Thomas on the ground. Hartford testified that appellant did not have a gun that night, because Hartford would have known if he did. Moreover, Hartford testified that he never saw appellant with a gun. On cross-examination, uHartford admitted that he was good Mends with appellant. Hartford also admitted that he never saw Thomas with a gun.
Appellant first testified as to the first exchange of words when Thomas noticed him wearing the medallion. Appellant further testified that after Thomas left once and returned they fought and appellant’s shirt got ripped. They then stopped fighting and Thomas got back in the van and left. When Thomas came back the last time, he was speeding up the street. Appellant saw him, ran through an alley and stood behind a house on Delachaise for about five minutes. Appellant alleged that when he came out Thomas was grabbing Hartford around the neck. Appellant then supposedly witnessed Thomas raise a gun. Appellant testified that he ran up and grabbed Thomas’s hand and the gun fired. Thomas and the gun fell to the ground. Appellant ran from the scene.
During the state’s case, the defense elicited testimony that the victim owned a gun; however, the state witness, Muse, testified that it was hidden away at her house and that Thomas did not have it on the night of the shooting. Because the defense attempted to prove that Thomas was armed with a gun on the night of the shooting and was shot by his own gun, the court permitted the state to rebut the presumption. In rebuttal, *1149 Muse testified that Thomas’s gun had been given to him by a friend. The gun was kept by Muse in her bedroom until her sister-in-law moved in with young children. At that time, Thomas moved the gun to a safer place in the house. Muse testified that she did not see the gun again until four months after the shooting, when her brother and a friend found the weapon while moving a stereo system out of the house. A ballistics expert testified that the bullet given to him in connection with this case was not fired from the gun from Muse’s home.[2]

PATENT ERROR REVIEW

A review of the record reveals no patent errors.

-¡¿ASSIGNMENT

Appellant avers that the trial court committed reversible error by excluding a statement by Hartford that, shortly before the fatal shot, someone in the crowd yelled that Thomas had a knife and a gun. Appellant contends that the excluded statement falls within the hearsay exception for an excited utterance. La.C.E. art. 803(2).
Hartford testified that Thomas had words with appellant, then left and returned. Hartford also testified that when Thomas came back Thomas was “threatening [appellant]; kept on saying that he was going to kill him.” At that point, the prosecutor objected that the above statement was hearsay. The trial judge called the attorneys, the witness, and the court reporter into chambers so that he could determine what the witness was going to say. Defense counsel then offered to go through the witness’s entire testimony.
In chambers, Hartford testified that Thomas grabbed the medallion and tore appellant’s shirt, the fighting stopped, and Thomas was still “talking about he was going to kill him and all like that.” During the course of that in-camera testimony, Hartford related that somebody started hollering down the street, “Run, he got a gun and a knife.” Hartford testified that appellant ran and everyone else was leaving. Hartford finally testified that, as Hartford was leaving, Thomas grabbed him and cut him around the neck. Hartford then heard the shot and Thomas fell to the ground.
The witness was instructed to return to the courtroom and the in-camera conference continued as follows:
By the court:
State, you have an objection to the testimony as to Clint Thomas’s statement, alleged statement that—
By Mr. Noland (defense counsel):
“Better watch your back. I’m going to kill you.”
By the Court:
Those statements.
By Ms. Lavie (prosecutor):
Yes, Judge.
By the Court:
I’m going to overrule the objection and allow those statements to come in. The basis for overruling the objection to facts; that save the defendant and save the defendant those propensities and bad acts on the part of the victim can, in fact, come in if they are statements supposedly made by the victim that would put the defendant at risk or fear for his own safety. [(¡Those statements are admissible; not for the truth, simply or the facts allegedly that were made.
By Ms. Lavie:
Judge, if he didn’t hear the statement, how can it be relevant for him being in fear to serve the defendant’s purposes? By the Court:
The statements that are made when he comes back on the scene to the witness as to the witness being cut and/or what he said to the witness when he has the witness by the neck, that’s one thing, but the statements that were made prior to his leaving the scene—
*1150 By Ms. Lavie:
Directly to the defendant—
By the Court:
Those statements are admissible. The statements that are made when he comes back to the scene when he allegedly has the witness by the neck are different; and, unless you can show as the state now argues that the defendant was present when those statement are made, I will, in fact, grant the State’s objection as to those statements. (Tr. 106-107)
Apparently, the trial court only considered the alleged threats made by the victim to appellant. The court ruled that only those threatening statements made by the victim in the presence of appellant were admissible. The witness’s testimony in chambers as to the statement by someone hollering, “Run, he got a gun and a knife,” was not ruled on by the court.
The trial resumed in the courtroom. The witness reasserted, before the jury, Thomas’s threats to appellant that he was going to kill him and that appellant had better watch his back. Direct examination of Hartford continued as follows:
Q What happened after that?
A He left and then somebody was hollering down the street, “Run.”
By Ms. Lavie:
Objection.
By the Court:
That’s sustained. You can’t tell us what somebody was hollering down the street. _|¿By Mr. Noland:
Don’t say what somebody was hollering. After the hollering, what happened? (Tr. 108-109)
When the state objected to the subject statement, the trial court sustained the hearsay and defense counsel even assisted the court by instructing his witness. Defense counsel never raised the hearsay exception for an excited utterance for the court’s consideration. Accordingly, because the court was not afforded the opportunity to cure the possible defect, appellant is precluded from raising the issue on appeal. La.C.Cr.P. art. 841.
Given the above, we affirm appellant’s conviction and sentence.

AFFIRMED.

. This testimony was admitted over the hearsay objection of the state, after the court determined that the declarant, Joan Thomas, was present in the courthouse.

. Because the bullet identified as taken from the skull of the victim was not entered into evidence, the ballistics expert could only testify as to the bullet fragment marked with the initial of the doctor who performed the autopsy, having come from the envelope bearing the doctor's name and the name of the victim, not as to the bullet which was taken from the victim's skull during the autopsy.